IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
_____

INTERSTATE NUCLEAR
SERVICES CORPORATION,

      Plaintiff,

v.                                           No. CIV 98-1224 BB/LFG

CITY OF SANTA FE,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the motion of Plaintiff, Interstate Nuclear Services Corporation ("INS"), for summary judgment. Having considered the several briefs of the parties and *amici* and entertained oral argument on two occasions, the Court is of the opinion the motion is well taken and it will be Granted.

### I. Background Facts

INS operates a Santa Fe laundry which cleans garments from workers exposed to various sources of radiation at the Los Alamos National Laboratory. This operation was licensed by the United States Atomic Energy Commission in

1957.  Since 1974, when the federal government delegated oversight authority to the State of New Mexico, INS has operated under a radioactive materials license from the New Mexico Environment Department ("NMED") and its predecessor agencies.  *See* 20 NMAC 3.1.30B(B).

In May 1996, the City of Santa Fe ("City") issued an "Administrative Compliance Order" ordering INS to cease and desist discharging water into City sewers.  Based on the cease and desist order, INS was unable to provide its local laundry service to the Los Alamos National Laboratory and was required to ship that laundry to California.  INS sued to overturn the City order in state district court.  *Interstate Nuclear Serv. v. City of Santa Fe*, SF 96-1546(C).  The parties settled that suit when INS agreed to build a new treatment facility which would satisfy the conditions imposed by the NMED.  Additionally, INS agreed to pay the City $50,000.00 to monitor its compliance.

Also during 1996, the NMED initiated hearings on the renewal of the INS radioactive materials license.  The City sought to intervene in these proceedings but was denied permission by the NMED.  Following the appropriate public hearing, the Secretary of the NMED approved the INS license renewal, subject to conditions, including the installation of new wastewater filtration equipment

which was designed to improve removal of radioactive material from the wastewater to meet state and federal standards. These conditions were incorporated into the license granted to INS in March 1998.

In spite of the NMED license, the City refused to lift its cease and desist order, relying upon its newly adopted Ordinance 1997–3 ("the Ordinance"). The Ordinance repealed the City's prior sewer provisions and, unlike the prior ordinance, imposed specific provisions regulating radiological materials of the type handled at the INS facility.

Prior to the adoption of the City Ordinance, the NMED had promulgated regulations on discharging wastewater containing radionuclides. These NMED regulations set out specific maximum dischargeable monthly concentrations for every radionuclide to be disposed into a public sewer. 20 NMAC 3.1.435(A); 20 NMAC 3.1.461. The state regulations are directly patterned on the guidelines promulgated by the United States Nuclear Regulatory Commission ("USNRC"). 10 C.F.R. Part 2, App. B. The City Ordinance uses the same units to measure radiological material as the NMED and the USNRC, but reduces the permissible level of radionuclide discharge by 98%.

The City Council debate over the Ordinance was lengthy, but can be summarized by reference to the recorded statements of several councilors.[1] Prior to the initiation of the debate, Councilor Montano cautioned, "I think it's going to be very important, as we make our comments, to understand that there is a possible threat of litigation out there. So I would think that it's important to watch what you say." Santa Fe City Council Notes 2-12-97 at 26. Nonetheless, several councilors raised serious questions about their authority to adopt the Ordinance and its effect. In this context there was substantial dialogue about the authority of the City *vis-a-vis* the state and federal governments. For example, in response to a question from a City councilor as to whether the Ordinance would be enforceable, the assistant city attorney attending at the meeting opined:

> In terms of jurisdiction, it's my understanding, and my legal research has indicated to me, that we do have jurisdiction, we do have from the Nuclear Regulatory Commission, who has usurped authority under federal law for most regulations of radionuclides in the United States especially when it deals with health and safety.

---

[1] The City argues legislative history is not a proper basis for statutory interpretation. This opinion does not rely on any or all of the Council debate to reach the holding herein, but notes the principle advanced by the City derives from the fact that there is no record of debate in the New Mexico legislature and not from anything inherently unreliable about such a legislative record. *See Regents of the Univ. of New Mexico v. New Mexico Federation of Teachers,* 962 P.2d 1236, 1246 (N.M. 1998) (noting absence in New Mexico of state-sponsored system of recording legislative history, with result that courts in this state engage in statutory construction rather than resorting to legislative history).

> However, where there is an economic interest of a municipality or a local entity, that municipality or local entity is allowed to protect its economic interest.

*Ibid* at 90.

Later in the discussion, Councilor Moore stated it was his opinion that "it is not the proper role of the federal government to set a maximum on how high a standard of health, safety or economic justifications that local government can set." After his analysis of the scientific basis for the City standards, he concluded:

> So anyway, what I'm trying to say is, these standards are stricter than the federal and state standards. Yes, indeed. Then, again, the federal and state government is unduly influenced by the nuclear industry. I think that is a well-known and well-documented fact. If we adopt standards that are stricter, and if we are one of the first several cities to do that in the United States, then that will be just one more of the ways in which we are The City Different and we are doing something unique that we can be proud of. I also think it makes sense [applause] – I also think it makes sense for us to worry about the marketability of our effluent ….

*Ibid* at 100.

The "problem" of the specific effect of the Ordinance on INS was also specifically discussed. Councilor Manning said:

> Oh, what this does, this section here, I think, by excepting certain facilities, is that it does make it seem as though we are targeting one certain business. And we know we're talking about INS. And with that regard, I would like to, at the proper time, perhaps make an amendment ….

*Ibid* at 91.

In debating the proposed amendment, the following exchange took place:

> **COUNCILOR MANNING:** This is an existing business right now. They're in operation right now.
>
> **COUNCILOR SANCHEZ:** No.
>
> **COUNCILOR MOORE:** No they're not.
>
> **COUNCILOR MANNING:** I mean, well, we shut it down, but if they want to come into compliance we need to give them some time.
>
> **COUNCILOR MONTANO:** Well, you know –
>
> **COUNCILOR BUSHEE:** – There are no limits in the ordinance. –
>
> **COUNCILOR MONTANO:** – No, we're not, you know, this really isn't targeted towards one particular industry.
>
> **COUNCILOR MANNING:** Well, it appears that way. I mean, to me it does.
>
> **COUNCILOR MONTANO:** Well, even if it is, they have two other locations. How are they going to be

> put out of business? They send the laundry to two other
> locations. So that is not a —

*Ibid* at 94-5.

## II.  The Issue

Does the City have the governmental authority to adopt a radionuclide water disposal standard fifty times more stringent than the standard adopted by the state and federal governments?

## III.  Discussion

### A.  Regulatory History

In 1974, New Mexico accepted partial responsibility for the regulatory function of nuclear materials. The Governor of New Mexico entered into an agreement with the United States Atomic Energy Commission ("AEC"), now the USNRC. 42 U.S.C. § 2021; NMSA 1978, § 74-3-15 (1993). The State then established the New Mexico Environmental Improvement Board ("EIB") which is an independent board whose members are appointed by the Governor with the advice and consent of the New Mexico Senate. NMSA 1978, § 74-1-4 (1993). The EIB is the state's radiation consultant and is statutorily required to "promulgate all regulations applying to persons and entities outside of the agency" for "liquid waste," "water supply," "hazardous wastes and underground storage

tanks." NMSA 1978 §§ 74-1-5, 74-1-8(A)(2) and (3) and (13) (1998); *see also* NMSA 1978 §§ 74-3-9 (1998) and 74-3-5 (1993). The NMED is the state agency that "shall maintain and enforce" EIB regulations in these areas. NMSA 1978 § 74-1-7 (1998). The NMED has indicated it will license INS to discharge its radioactive waste into the City's sanitary sewer if each of the following requirements were met:

1. The material is readily soluble, or is readily dispersible biological material, in water; and

2. The quantity of licensed ... radioactive material that the licensee ... releases into the sewer in 1 month divided by the average monthly volume of water released into the sewer by the licensee ... does not exceed the concentration listed in Table III of Appendix B [20 NMAC 3.1.361]; and

3. If more than one radionuclide is released, the following conditions must also be satisfied:

    a. The licensee ... shall determine the fraction of the limit in Table III of Appendix B represented by the discharges into sanitary sewerage by dividing the actual monthly average concentration of each radionuclide released by the licensee ... into the sewer by the concentration of that radionuclide listed in Table III of Appendix B; and

    b. The sum of the fractions for each radionuclide required by § 435A3(a) [next preceding subsection] does not exceed unity; and

> 4. **The total quantity of licensed ... radioactive material that the licensee ... releases into the sanitary sewerage in a year does not exceed 5 Ci (185 Gbq) of hydrogen-3, 1 Ci (37 Gbq) of carbon-14, and 1 Ci (37 Gbq) of all other radioactive materials combined.**

*See* 20 NMAC 3.1.435(A); 20 NMAC 3.1.461.

The USNRC reviews the NMED's performance to ensure consistency and compatibility with the USNRC's radioactive materials requirements. If the state program is incompatible with federal standards or the state is found incapable of discharging its duty to provide regulatory oversight, the USNRC can terminate or suspend all or part of its delegation to the state. 42 U.S.C. § 2021(j).

In a June 1995 policy statement, the USNRC recognized a publicly owned treatment works ("POTW") may implement or establish a pre-treatment program "if its pollutants (such as radioactive materials) cause interference with their processing technology." Whether the City has established that the INS discharge meets this standard is contested. It is clear, however, that the USNRC together with the United States Environmental Protection Agency has initiated a survey of radionuclide levels in sewage sludge processed by various POTW's. The City was solicited to participate in this survey, but it declined.

**B. Governmental Authority**

The City's initial, and not insubstantial, hurdle is to show that as a creation of the state, it has the authority to override the liquid waste standards adopted by the NMED. Municipalities are creatures of the state and their powers are derived from the state. *Purcell v. City of Carlsbad*, 126 F.2d 748 (10th Cir. 1942); *Morningstar Water Users Assn. v. Farmington Mun. Sch. Dist.*, 901 P.2d 725 (N.M. 1995). "Municipalities have only those powers expressly delegated by state statute." *City of Santa Fe v. Armijo*, 634 P.2d 685, 686 (N.M. 1981). *See also Sanchez v. City of Santa Fe*, 481 P.2d 401 (N.M. 1971). New Mexico municipalities thus have no inherent right to exercise police power but rather all such rights must derive from authority specifically granted by the state. *Temple Baptist Church v. City of Albuquerque*, 646 P.2d 565 (N.M. 1982); *City of Santa Fe v. Gamble-Skogmo, Inc.*, 389 P.2d 13 (N.M. 1964). In its *amicus* brief, the NMED asserts:

> NMED is the only agency under New Mexico law authorized to implement the EIB's radioactive materials regulations, as prescribed by NRC; and the EIB and NMED neither have, nor have authority to, subdelegate this duty to the City.

Br. *Amicus* of the NMED at 4.

The City argues, "the State has delegated to the City the legal authority necessary to establish, maintain, operate and regulate sewage treatment facilities and to protect those facilities from damage and economic loss. *See* NMSA 1978 § 3-26-1 *et seq.*" (City's Resp. at 3.) The statute relied on by the City authorizes a municipality to "acquire and maintain facilities for the collection, treatment and disposal of sewage." § 3-26-1A(1). That act goes on grant authority to allow eminent domain and authorize the general governmental power necessary for a city to acquire and operate a sewer system. However, a statute making a grant of power to a municipality must be strictly construed and the city must keep closely within its limits. *City of Clovis v. Cram*, 357 P.2d 667 (N.M. 1960). There is nothing in the Sewage Facilities Act giving the City power to establish radionuclide standards or even regulate water discharge quality.

In contrast to the general authority granted local governments in the Sewage Facilities Act, the Environmental Improvement Act, NMSA 1978 § 74-1-1 *et seq.*, specifically grants the NMED authority over both nuclear safety and water quality. Section 74-1-7A directs the NMED to "maintain, develop and enforce regulations and standards in the following areas: ... (2) water supply, (3) liquid waste ..., (5) radiation control ..., (13) hazardous wastes and underground

storage tanks." As a matter of statutory interpretation, then, the specific grant to the NMED in the Environmental Improvement Act must trump the City's claim to general authority under the Sewage Facilities Act. *Stinbrink v. Farmers Ins. Co.*, 803 P.2d 664 (N.M. 1990) (a specific statute on a subject controls over the more general).

The New Mexico Court of Appeals rejected a very similar contention in *New Mexico Mun. League, Inc. v. New Mexico Envtl. Improvement Bd.*, 539 P.2d 221 (N.M. App.), *cert. denied*, 540 P.2d 248 (1975). In that case the Municipal League argued that New Mexico municipalities had general statutory authority to maintain and operate solid refuse disposal areas and therefore the EIB regulations governing how refuse was to be picked up and transported were invalid. In rejecting municipal reliance on the general statutory authority to "acquire and maintain refuse and disposal areas or plants," the Court of Appeals used language apropos to the present dispute:

> This section merely gives municipalities the option or discretion to enact ordinances governing the collection and disposal of refuse. The Environmental Improvement Act, Sections 12-12-1 through 12-12-14, N.M.S.A. 1953 (Repl. Vol. 3, Supp. 1973) is a comprehensive act which applies not only to liquid waste and solid waste sanitation and refuse disposal, but also to such additional and diverse fields as "food

> protection", "water supply and water pollution", "air quality management", "radiation control", "noise control", "nuisance abatement", "vector control", "occupational health and safety", "sanitation of public swimming pools and public baths", and the general sanitation of public buildings. Section (sic) 14-49-1 through 14-49-7, of the Municipal Code, supra, cover only "refuse" (as defined in § 14-49-1) collection and disposal. <u>It is manifest that it was the intention of the legislature to give the Environmental Improvement Board state-wide, paramount authority to "enforce regulations and standards" in the various areas listed and that all other entities of government and political subdivisions thereof must conform.</u>

539 P.2d at 226-27 (emphasis added). *See also* N.M.A.G. Op. No. 87-48 (1987) (legislature intended to give NMED "exclusive state-wide authority to promulgate and enforce regulations in those areas).

The City's lack of specific authorization to regulate nuclear discharge or even water pollution makes it clear the Ordinance at issue is invalid as beyond the City's delegated authority. Moreover, the subject of radionuclide discharge is specifically committed to the NMED. The Ordinance is an attempt by the City to usurp the authority to regulate "liquid wastes," "radiation control," and "hazardous wastes" that was specifically granted to the NMED by the New Mexico legislature and it is therefore invalid.

Both parties and the *amici* have devoted substantial argument to the question of whether the Ordinance is preempted by the Atomic Energy Act, 42 U.S.C. § 2011 *et seq.*, and regulations of the USNRC. *See, e.g.*, 10 C.F.R. pt. 20, App. B. The City concedes the field of nuclear safety is wholly occupied by federal law but argues that the City is free to protect its economic interests. *See Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 205 (1983). There is no question, however, that the effect of the Ordinance is to limit the percentage of radionuclide discharge to 2% of that permitted by state and federal standards. There can also be little serious debate that the City standard, setting the hurdle 50 times higher than state or federal standards, would make it close to impossible for INS to operate a Santa Fe laundry in Santa Fe to service the Los Alamos National Laboratory. Substantial legal precedent[2] might therefore support federal preemption. Based on this Court's finding that the City lacks the authority under New Mexico law to regulate radioactive waste discharge, however, it is unnecessary to decide federal preemption.

---

[2] *See, e.g., State of Nevada v. Watkins*, 914 F.2d 1545 (9th Cir. 1990), *cert. denied*, 499 U.S. 906 (1991); *Jersey Cent. Power & Light Co. v. Township of Lacey*, 772 F.2d 1103 (3d Cir. 1985), *cert. denied*, 475 U.S. 1013 (1986); *City of New York v. United States Dep't of Transp.*, 715 F.2d 732 (2d Cir. 1983); *Washington State Bldg. & Constr. Trades Council v. Spellman*, 684 F.2d 627 (9th Cir. 1982), *cert. denied*, 461 U.S. 913 (1983); *United Nuclear Corp. v. Cannon*, 553 F. Supp. 1220 (D.R.I. 1982).

# O R D E R

For the above stated reasons, Interstate Nuclear Services' motion for summary judgment is GRANTED. A Judgment consistent with this opinion shall be drawn up by counsel for Plaintiff and presented to the Court within twenty (20) days.

Dated at Albuquerque this 27th day of January, 2000.

*[signature: Bruce D. Black]*

**BRUCE D. BLACK**
**United States District Judge**

**Counsel for Plaintiff:**
    Charles A. Pharris, Gary J. Van Luchene, Keleher & McLeod, Albuquerque, NM
    Gregory A. Bibler, James C. Rehnquist, Andrew E. Lelling, Boston, MA

**Counsel for Defendant:**
    Ellen S. Casey, Gary W. Larson, Hinkle Cox Eaton Coffield & Hensley, Santa Fe, NM

**Counsel for *Amicus Curiae* NMED:**
    Geoffrey Sloan, Special Assistant Attorney General, Santa Fe, NM